JODI LINKER
Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:         Angela_Chuang@fd.org

Counsel for Defendant MELENDEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 22–26 MMC |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | **Court:** Courtroom 7, 19th Floor |
| EMIL ARRIOLA MELENDEZ, | **Hearing Date:** June 8, 2022 |
| Defendant. | **Hearing Time:** 2:15 p.m. |

**INTRODUCTION**

Emil Arriola Melendez, who has only one prior misdemeanor conviction and who has never spent more than two days in jail before this case, now comes before this Court for selling fentanyl and heroin to an undercover officer—conduct that he engaged in due to his fervent desire to earn money to support his family in Honduras. The impoverished environment in Honduras led him to the U.S. in 2017 in search of better, higher-paying opportunities. Once in the U.S., Mr. Melendez worked various jobs, including home remodeling/painting and warehouse work to support not only himself, but also his wife and three children. His life in the U.S. was not without significant obstacles. His employment was unstable; prior to his arrest for this offense, Mr. Melendez had been out of work for six months. These challenging circumstances and the enormous pressure he felt to continue sending money back to his family resulted in his regrettable and desperate decision to resort to dealing drugs. And only two years prior, in September 2019, Mr. Melendez had been brutally assaulted, robbed, and stabbed while waiting at a bus stop. He underwent emergency surgery at the hospital, where surgeons had to open up his entire abdomen to try to repair the damage. It was such a serious injury that he had to rely on a colostomy bag for months afterwards. Needless to say, this unprovoked attack and its aftermath left Mr. Melendez left with substantial scars—both physically and emotionally—from which he has yet to recover.

Mr. Melendez takes responsibility for his actions and understands that he must face consequences for what he has done. He respectfully requests that the Court vary downwards and impose a sentence of 10½ months—because BOP good-time credits do not apply to sentences shorter than one year, this custodial sentence is roughly equivalent to the amount of time that a person would serve if sentenced to 12 months and one day. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

**ARGUMENT**

**I.   A Sentence Of 10½ Months Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)**

In sentencing Mr. Melendez, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The

overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Mr. Melendez agrees with the Guidelines calculation in the Revised Presentence Report ("PSR") with a final offense level of 23 after a safety-valve reduction and a Criminal History Category of I. *See* PSR ¶¶ 28, 33. The resulting advisory Guidelines range is 46–57 months.

### A.     The nature and circumstances of the offense

In September and October of 2021, Mr. Melendez sold fentanyl and heroin to an undercover officer whom he believed to be a drug purchaser. *Id.* ¶¶ 7, 9, 11. As detailed in the PSR, the weight of the drugs that was used for Guidelines calculations was 337.85 grams of fentanyl and 56.7 grams of heroin. *Id.* ¶ 19. Mr. Melendez was arrested on November 20, 2021, during a traffic stop, during which additional controlled substances were found on his person. *Id.* ¶ 13. A firearm was found during a subsequent search of his residence. *Id.*

From the inception of the case, Mr. Melendez has consistently and unwaveringly taken responsibility for his actions. He understands that circulating these substances, particularly fentanyl, can have serious and tragic consequences. It was never his intention to harm anyone, and the idea that his conduct may have hurt other people haunts him. *See* Chuang Declaration in Support of Defendant's Sentencing Memorandum ("Chuang Decl."), Ex. A (Emil Melendez Arriola Letter).

**B.     The history and characteristics of Mr. Melendez**

1. Conditions in Honduras

As set forth below, Mr. Melendez came to the United States from Honduras because steady, well-paying job opportunities were difficult to secure and he wanted greater financial stability for his family. Although this fact does not excuse Mr. Melendez's criminal conduct, it does provide an important perspective, especially when considering the role in creating those conditions in Honduras played by the same federal government prosecuting him here.

Honduras is a dangerous and violent country with one of the highest murder rates in the world. *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL [hereinafter 2018 Crime & Safety Report][1]; *see also* Gangs in Honduras, INSIGHT CRIME [hereinafter Gangs in Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not at war.").[2] Tegucigalpa, the capital of Honduras as well as Mr. Melendez's hometown, and San Pedro Sula, the country's economic center, are two of the ten most dangerous cities in the world. Central America Refugee Crisis, U.N. REFUGEE AGENCY[3]; *see also* Gangs in Honduras at 1. Violence in Honduras includes "homicide, extortion, kidnapping, torture, human trafficking, intimidation, and other threats . . . ." Country Report of Human Rights Practices for 2018, Honduras, U.S. DEPT. OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR at 1.[4]

Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades. In the 1980's, the United States used Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.* Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal groups began to form throughout Central America. *Id.* According to the Wilson Center, crime generally goes unreported because of corruption, weak law enforcement, and active criminal groups.

---

[1] Available at https://www.osac.gov/Content/Report/84d448fd-c42b-462c-91ce-15f4ae5df483.
[2] Available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf.
[3] Available at https://www.unrefugees.org/emergencies/central-america/.
[4] Available at https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/honduras/.

DEF'S SENT. MEM.
*MELENDEZ*, CR 22–26 MMC

4

*See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON CTR RPT. ON AMERICAS [hereinafter Crime and Violence] at 1–2.[5] In 2009, a military coup ousted Honduras President Zelaya making Honduras the first Central American country to undergo a coup in nearly two decades, and in 2017, the Honduran presidential election came under question as many organizations noticed irregularities with the results. *See* Central America's Violent Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN RIGHTS WATCH (Dec. 2017).[6] Because of the instability and unrest within Honduras, the United States has issued warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report. These travel warnings are indicative of the safety concerns in the country that destabilize the economy and daily life for most Hondurans, demonstrating why many people such as Mr. Melendez are fleeing in hopes of creating safer and more sustainable lives.

### 2. Mr. Melendez's background

Mr. Melendez was born in Tegucigalpa, Honduras, where he lived for most of his life. PSR ¶¶ 38, 40. His parents both worked throughout his childhood and were able to meet his basic needs "most of the time." *Id.* ¶ 39. In 2017, at the age of 29, he made the difficult decision to leave his family to travel by himself to the United States in search of economic opportunities so that he could better support them. *Id.* ¶ 40. It is clear from the numerous letters of support submitted on his behalf that at his core, Mr. Melendez is a family man devoted to his wife and children. As Francis Martinez writes, "Emil always had the dream of growing: he was full of energy and strength to support his three children and give them the best and he decided to leave the country and risk everything in order to continue supporting his family." *See* Chuang Decl., Ex. B (Letters of Support – English; Francis Martinez Letter). And Mr. Melendez's uncle elaborates on the circumstances that compelled Mr. Melendez to come to the U.S. in the first place: "As a responsible man he dedicated himself to working to support the household, but due to the conditions in our underdeveloped country, a lack of

---

[5] Available at https://www.wilsoncenter.org/sites/default/files/media/documents/publication/FINAL%20PDF_CARSI%20REPORT.pdf.
[6] Available at https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-expression.

employment and decent life opportunities for a family, he was forced to emigrate to this country in order to provide a better quality of life for his family . . . ."). Chuang Decl., Ex. B (Letters of Support – English; Alvaro Augusto Arriola Arias Letter).

Since he has been in the U.S., Mr. Melendez has pieced together employment at various jobs in order to earn money to support himself and to send back to his family in Honduras. Through the years, he has worked in construction, home remodeling/painting, laboring jobs, and warehouse jobs. PSR ¶ 51. Much like it did for tens of millions of other people, the COVID-19 pandemic significantly impacted his ability to work steadily. *See id.* At the time this offense conduct occurred, he had been unemployed for the past six months. *Id.* Mr. Melendez understandably felt enormous pressure to continue financially supporting his family as he had been, but was left with few options. Against this backdrop, he regrettably turned to selling drugs in order to make money so that he could continue to fulfill his all-important family obligations, which had become even more important after the 2020 hurricane season.

In late 2020, two massive hurricanes—Eta and Iota—devastated Honduras within weeks of one another, destroying entire communities and wreaking havoc on agriculture and other infrastructure. *See, e.g.*, Jason Beaubien, *Even Disaster Veterans are Stunned by What's Happening in Honduras*, NPR (December 14, 2020, 7:46 AM) ("Aid officials say that the damage from hurricanes Eta and Iota rival that caused by Hurricane Mitch, one of the deadliest Atlantic storms of all time.").[7] The hurricane damage was so extensive, and local government so corrupt, that large-scale relief and repair efforts had yet to be planned or implemented nearly a year later, in the fall of 2021. *See, e.g.*, *Hondurans Still Hurting From the Hurricanes*, RELIEF WEB (U.N. OFFICE FOR THE COORDINATION OF HUMANITARIAN AFFAIRS) (Oct. 7, 2021) ("Responsible authorities have not fulfilled commitments, public contracting process[sic] are opaque, the police often quell mobilizations and bribery and corruption mar the repair work.").[8] In the direct aftermath of the hurricanes, even though he had little to his name, Mr. Melendez unhesitatingly gave what he could to help. *See* Chuang Decl., Ex. B

---

[7] Available at https://www.npr.org/sections/goatsandsoda/2020/12/14/945377248/even-disaster-veterans-are-stunned-by-whats-happening-in-honduras.
[8] Available at https://reliefweb.int/report/honduras/hondurans-still-hurting-hurricanes.

(Letters of Support – English; Hugo Milton Amaya Garcia Letter) ("During the season of hurricanes that ravaged the country in 2020, I was able to see his generosity towards the people who lost many of their belongings with the destruction caused by ETA and IOTA when, without even being asked, he donated cash and some of his belongings, showing in this way empathy for the community around him."). His generosity of spirit is also reflected by his participation in church activities and volunteering to distribute food to people in need. PSR ¶ 43.

Life in the U.S. has not been easy for Mr. Melendez, and not only because of difficulties finding work. In September 2019, he was nearly killed when two people attacked him from behind and robbed him while he was waiting at a bus stop. *Id.* ¶ 41. During this brutal assault, he was stabbed by one of his assailants. *Id.* Mr. Melendez was rushed to the hospital—the injury from the stabbing was so severe that he had to undergo emergency surgery because blood was filling his abdomen. *Id.* Even after the several weeks he spent in the hospital, his recovery was prolonged and required him to use a colostomy bag for several months afterward. *Id.* Chuang Decl., Ex. A (Emil Melendez Arriola Letter) ("I was in surgery for around 6 hours. They opened my stomach, they repaired my intestine, and they put a colostomy bag in me."). His brush with death has left deep scars that go well beyond the physical. "Every time I take off my shirt, that sad and painful moment comes to me when I look at my scars. I had never thought of living through something like this in my life." *Id.* He recognizes with great shame that he never should have thrown away his second chance at life by engaging in the offense conduct that brings him before this Court now. *See id.* ("In truth, I tell you from the bottom and deepest of my heart, I regret everything bad that I have done and all the good that I have stopped doing by committing this type of crime and for the people to whom I could have caused harm.").

The letters of support from Mr. Melendez's loved ones paint the picture of a devout, generous man who lost his way, but who will have significant familial and communal support to help him find his way back. The lessons that he has already learned since his arrest have solidified his determination to return to his family and to the law-abiding life he had led in the past. Significantly, this case represents Mr. Melendez's first felony conviction. He has no history of violence and a minimal prior record consisting of a single misdemeanor conviction for Accessory in 2019. *See* PSR

¶ 31. On that case, he spent only two days in jail. *Id.* His pretrial detention since November, then, is by far the longest time he has ever spent in custody; accordingly, a 10½ month sentence—magnitudes greater than his prior sentence—would adequately punish him and deter him from future criminal conduct.

### 3. Immigration consequences for Mr. Melendez

Even though this case constitutes his one and only felony conviction, and despite his minimal prior criminal record, that is enough to subject Mr. Melendez to draconian immigration consequences. Before this case, Mr. Melendez had applied for a U-visa—given to victims of violent crimes and requiring reporting to the authorities—based on his stabbing in 2019. *See* Chuang Decl., Ex. D (Immigration Attorney Sara Izadpanah Letter). If he had been granted a visa, it would have allowed him to bring his wife and children into the country legally as well. *Id.* The likelihood of him being granted a U-visa is now vanishingly small due to this conviction. *Id.* ("Factors that make applicants ***ineligible*** for a U-Visa are inadmissibility grounds, such as health concerns, crimes of moral turpitude, security grounds and criminal grounds including drug offenses. Criminal convictions, *specifically* drug related offenses and aggravated felonies, make Mr. Melendez inadmissible and can either require him to meet a higher discretionary burden and request a waiver.") (emphasis in original).

It is almost certain that Mr. Melendez will be deported following resolution of the instant matter. Because of the nature of the charge, this conviction will also trigger severe immigration penalties beyond deportation and loss of a potential U-visa. Almost every avenue for relief that he otherwise would be able to pursue as a potential defense in immigration proceedings will no longer be available to him, and Mr. Melendez likely will be rendered permanently inadmissible to the United States, meaning that he will be barred from re-entry for the rest of his life.[9] *See id.* ("[N]oncitizens who have been convicted of an 'aggravated felony' are prohibited from receiving most forms of relief that would spare them from deportation, including asylum, and from being readmitted to the United

---

[9] The reason why Mr. Melendez is requesting a 10½ month sentence rather than a sentence of 12 months and one day (which are roughly functionally the same in terms of actual custodial time) is because if he receives a sentence shorter than one year, that may leave open a remote—though still unlikely—possibility of requesting a waiver of inadmissibility.

DEF'S SENT. MEM.
*MELENDEZ*, CR 22–26 MMC

States at any time in the future."). Finally, before deportation, he could spend an uncertain period of time in immigration detention—a time period that could easily stretch to a month or more—which would serve as an additional custodial consequence of his conduct.

## CONCLUSION

For all the reasons set forth above, Mr. Melendez respectfully requests that the Court impose a sentence of 10½ months, which is roughly the same as he would serve on a sentence of 12 months and one day. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated:   June 1, 2022              Respectfully submitted,

                                    JODI LINKER
                                    Federal Public Defender
                                    Northern District of California

                                             /S
                                    ANGELA CHUANG
                                    Assistant Federal Public Defender